May it please the Court. Brian Cerullo in King 4 on behalf of Appellant First Southern National Bank. Evaluation of bankruptcy is like a room. There's a ceiling and a floor. Whether the ceiling is high ceiling or low ceiling, that's what the Rash decision was about. It was a ceiling case. But the ceiling can't be lower than the floor, which is foreclosure value, and unfortunately that's what happened here. Fundamentally, a secured creditor, when it takes a lien... Why can't it? I mean, the issue in Chapter 11 is whether the asset, whether the plan will work, right? So you have to value the assets for purposes of assessing the plan. And why isn't the value to the plan what matters? I mean, it seems perfectly straightforward. Well, the valuation under 506 doesn't exist in a vacuum because 506, the second question, the first question is it's asking you to value the creditor's interest. The second question is... You want to argue for foreclosure value, which in this case happens to be higher than the working asset value. But why? What's so good about foreclosure value? Why is that the better valuation, other than the fact that it helps your client? I'm not saying it's a better valuation, but I'm saying it's a minimum valuation. In other words, under 506... Why is it a minimum valuation? Because under 506, what it requires is, under the second part of Section 506, the purpose of the valuation has to be considered. So when the purpose of the valuation is planned confirmation with respect to a secured creditor, that necessarily implicates Bankruptcy Code Section 1129B and the fair and equitable test. And so when you're talking about value, it's one or two things that has to occur here. Either value becomes meaningless in the context of the entire code, or you have to read it within the very section which you're valuing. And so when you're valuing for confirmation purposes, you implicate the fair and equitable test, which for 80 years has been very clear that the creditor has to realize it's completely compensatory, indubitable equivalent, its claim or its property. That's why it becomes relevant. That's why there's a minimum for that. Now, just because there's a minimum, what the rash case is about is the rash case is taking the position of saying, look, when a debtor decides to retain property, when the debtor retains property, it's subjecting the creditor to certain risks, double risks it says, and therefore should be compensated for that. So the issue in the rash case was not to dispense with a liquidation value floor. It was just to say that creditors aren't entitled to something more. In fact, the Ninth Circuit in Taffy came to the precise conclusion in that regard with respect to requiring more than the liquidation value. So if your view prevails, that makes the plan unfeasible, right? The plan would require substantial more capital to be contributed in order to satisfy the first Southern claim. That's correct. Your client sought a stay in the district, in the bankruptcy court and in the district court, or I guess in the district court, but did not seek a stay from this court. Is that correct? There are two appeals. The first appeal, set of appeals, we sought and obtained a stay at the district court and then appealed to this court under the flexible finality rule. Right. It's the second appeal. In the second appeal, we sought a stay at the bankruptcy court, sought a stay at the district court. And by the time in May of 2013, when the district court had ruled, the plan had already been substantially consummated. Well, and that's what concerns me. Why doesn't the consummation of the plan make the appeal moot? Well, under the equitable mootness standards that have been articulated by the court, one, I believe we properly sought all avenues of appeal that were appropriate. Well, did you seek a stay from this court? Did you seek anything that would prevent the consummation of the transaction? We sought that through the district court. But not any further? Not any further. So that goes back to the question I posed. Why not? Well, we believe that we satisfied the standards with respect to the plan had already at once the, once the, when the district court on the eve of the end of 2012 denied the stay, the plan was immediately consummated. It was, there was not an opportunity. We've got staff attorneys on call for emergency motions, and judges get those calls on a recurring basis. I guess I'm still not hearing a reason why it wasn't further pursued. Well, Your Honor, I believe we had, we pursued actively through two sets of appeals of various stays, and the, the plan went effective immediately after a ruling by the district court. I mean, there are a lot of things once the transaction is consummated, that means you can't unwind the transaction in a lot of contexts. Not necessarily, because there, the, of the, of the four standards, in some cases there are cases where a party does not even seek a stay, and the equitable mootness has not been found. There's also the issue, is there undue burden on the innocence, or can the bankruptcy court on remand fashion an equitable remedy? And, and in this case, there's remarkably little that happened when this plan went effective. Well, two people put in some money that they hadn't put in before. They, they did. The, what, what, generally when, well, first of all, to look at the, the parties that are involved in this case in terms of the innocence. There's two parties that are, there are three sets of constituencies. The first, I'll say, is essentially the city and the state of Arizona, the, the, the state of Arizona and the city of Phoenix. Those parties cut their deal years ago with respect to expressly subordinating their interests, both their liens and the affordable housing restrictions. So, those parties, there's no reliance on the confirmation. I'm, I'm focused on the new money that comes in. Those are the people that are affected. Yeah, with C&C, is that what it was? Pardon? The, the new money, the one point. Yeah, the quarterstone. Yeah. There's then the, as, as far as C&C is concerned, they're, they're certainly, they're a party before the court. They've been, they were not just. It's not a real party, though. It would depend how you define real party. They're not a party to the proceeding. They're, they're not a party to the proceeding, but they were, they were the dip lender during the course of the proceedings that advanced and financed and essentially orchestrated the case. It's not as if they were a stranger who entered the proceedings at the end. They've been involved in all, in all aspects of the proceeding. And they also knew as and when they funded, because there's, there's a, not only, there's a jurisdictional issue at, at play here as well. They knew that there was a potential that on the first appeal, under the flexible finality standard, that the bankruptcy court may not have had jurisdiction to enter a confirmation order. But at the, at the pursuing of cornerstone, there was vast play at the bankruptcy court level and slow play at the appellate level. Well, basically you're saying that the people that brought in new money were at risk. So you should never need to seek a stay because they knew they were at risk. No. I think what we're saying is that we, we took steps to seek a stay. But you didn't to this Court. Not to this Court, correct, Your Honor. And is there, do you have any case law that suggests that it's okay to stop after you seek it from the district court, that you don't have to go to the court of appeals? I believe there's case law that's in the circuit that's, that. We've got case law that suggests you have to go to the circuit justice even. I, I'm not aware of any authority to suggest that you need to go that far. I believe the authority is more in terms of, of diligently pursuing rights, but not that it has to be to that extent. And in fact, the, the focus tends to be on the focus on the, the impact on the innocence as well as whether the bankruptcy court can fashion an equitable remedy. So, so you said that the plan has been substantially consummated? Correct. So how would you get back, I mean, assuming you were to prevail in anything, how would you unravel all of that? Yeah. Normally when, in, in, in the fashioning of an equitable remedy, there are a lot of times there are very complex cases that are out there where you have insurance trusts being set up, all kinds of things going on. Maybe there's a property that's sold. Maybe there's a bank that lends new money and takes liens on property or things of that nature. But that's not the case here. There's actually quite a bit available at the, at the bankruptcy court level. First of all, we're talking about a transfer. There was 1.2 million that was transferred in. Of that, approximately $700,000 was paid out just simply to professionals in the past time and postpetition in connection with litigating this appeal. There's very little that went out to any, any other, other parties. That money's gone. Well, it's been paid to professionals. Can the new money be paid back? Pardon? The people that put the new money in, can they get their money back? There's also, I, I, yes, they can. And they may have already earned it, because given that the plan went effective at the end of 2012, the effect is that they've earned tax credits of $539,000 a year over the last two years. They've already earned those. So the issue for the bankruptcy court and what the bankruptcy court is very capable of doing is fashion an equitable, equitable remedy, particularly when we're dealing with a money issue here. We're talking about, we're talking about dollars. And there's issues the bankruptcy court will be able to consider with respect to the tax credits that have been received. There's $450,000 in cash sitting there at the complex right now. That's pursuant to the projections that they filed that are part of the record in connection with the plan. Is the IRS required that that property remain as low-income property, you know, whatever it's called, tax-eligible property for a certain number of years? I understand that it has to be qualified at the time that the credit's taken. I don't know. I can't speak to the IRS issues on that. So the answer you give us is you don't know what it would require to undo this is the bottom line. No, I think the issue is there would have to be an assessment of. No, that's not what you're saying? Do you know what it would take to undo this plan? Standing there, as you stand there, start with a yes or no, and then you can tell me. Yes. Okay. Start with the tax issues. Well, with respect to the tax issues. He said yes. So that means you must be able to tell me everything, all the implications. So start with the tax issues. With respect to the tax issues, the formulation of an equitable remedy is going to have to be taken in whole in terms of assessing the situation. In papers that were filed with the court in the reply on the mootness claims, it was clear that the tax issues that Cornerstone was talking about were matters of— You don't know whether or not undoing the plan will cost, right now, if we could undo the plan today, or on remand, if that's what we ordered, whether the federal government would roll back the tax credit. They would say the plan didn't last long enough, so you'll have to pay back the tax money. Do you know the answer to that question? I do not know the answer to that, Your Honor. So it's a little difficult to answer. This gets back to, I think it was Judge Clifton's question. What would it take—isn't it too late now to undo the plan? Isn't it so complicated, not having gotten a stay from us, or not having at least thought of a stay from us, isn't it too late? Because there are uncertainties that we can't resolve. It's not too late because in the circumstance of this case, we have a property that's worth more than $8 million in value. There's cash of $400,000 that's there. There may be insurance proceeds of an additional $600,000 or $700,000 that's there as well. There's enough value down there at the bankruptcy court. The bankruptcy court deals with situations all the time that would be a lot more difficult than this one, of trying to figure out how to sort out and provide an equitable remedy for Cornerstone. When you say it's worth $8 million, it's worth $8 million to your client, right? That was—I used that number because that was the one the bankruptcy court used in terms of identifying that would be— Take away the restrictions, right? If the—at foreclosure, correct. Your Honor, I'd like to reserve the remaining time for rebuttal. Okay, thank you. May it please the Court, Susan Freeman on behalf of Sunny Slope Housing Limited Partnership. The investors invested their $1.2 million only after the bankruptcy court denied the stay and the district court denied the stay. There were three remaining days before they invested on December 31st in which the bank could have sought an appeal from this court. It could have posted a supersedious bond. It's a bank. It did nothing. At that point in time, they invested. That money has gone out the door. It cannot be recovered. They also are subject to $1.5 million in tax liabilities because they invested pursuant to a 1033 exchange. Why can't it be recovered? It cannot be recovered because if this exchange is unwound, if this investment is unwound under Section 1033 of the Internal Revenue Code, they will retroactively lose the benefits of that party investment. They also would lose the tax credits. At page 13 of the 2012 answering brief, we've cited the Treasury regulation which provides that not only do they not get ongoing tax credits, but the tax credits are retroactively lost back to the date that they were initially went into practice. If, in fact, the property is not used as affordable housing for the full 15-year initial period, the compliance period set forth in the Treasury regulations. So they lose all of that. This is, in fact, like the season's target. So what happens? You may not know the answer to this, but what happens if we affirm the plan goes forward and then in two years it gets into trouble again? If it gets into trouble again, then the Southern National Bank can foreclose at that point in time the tax credits end and the affordable housing restrictions end. That's pursuant to the language of the Southern National Bank. Kennedy, are the tax credits lost from the past? No. At that point in time, the tax credits would not be retroactively lost because it would be pursuant to a foreclosure. That's pursuant to the Southern National Bank. Well, why wouldn't the same thing apply here? Because it's not pursuant to a foreclosure. If, in fact, the Court were to reverse the plan confirmation and then they would lose the benefits of or they would lose all of the $1.2 million they put in, they would lose. Sounds pretty much like a foreclosure to me. But it's not. It's not until unless the Court reverses. If the Court reverses, then there would be a foreclosure. At that point in time, the individual investors, the cornerstone at Camelback who is not a party to this appeal, the individuals behind it who are not parties to this appeal, and the State of Arizona and the City of Phoenix who are not parties to this appeal, would lose substantial amounts. The City of Phoenix. Well, the last two, the City and State, would lose anyway, because their loss is based on having junior positions. They put no fresh money in, did they? They put initial money under the plan. They put initial money. Did they put any fresh money in? They did not put any fresh money in. So the fact that there was no stay didn't adversely affect them. It does affect them in the sense that they voted for this plan under which they get paid in full. But if they had no option. But the point is, Your Honor, that if in fact this plan is reversed, those are innocent third parties who will suffer. The absence of a stay had no impact on them whatsoever. The absence of a stay meant that the investors were willing to put in money, forward this, and they will suffer from this as a result. The point is, Your Honor, that there are independent innocent third parties who will suffer from a reversal. And that's one of the reasons. And so we get to that then. And how is it the bank wasn't screwed by this? I mean, they acquired a note from HUD specifically on terms that provided for the release by HUD of the restrictive covenant. No, Your Honor. That is absolutely wrong. From HUD? No, Your Honor. That is wrong. And the other covenants come from the junior mortgages. No, Your Honor. Excuse me. That is absolutely wrong. The purchase from HUD provided for the release of the HUD regulatory agreement, which only required there to be for the property to be maintained and for some investment. I used the wrong term, but I have the right concept. HUD let go. No. HUD kept the affordable housing covenants and restrictions intact. That was the IDA regulatory agreement. It was not reversed. That was part of the original deal. HUD put in the money. Bond investors put in the money that funded this capstone loan. It was all part of an integrated transaction that First Southern knew about when it bought this. And when it bought that property from HUD, it bought it pursuant to a purchase agreement that expressly said it was subject to the ability to, I'm sorry, it was  subject to the ability to purchase a property. And it bought it knowing that.  It bought it knowing that. It bought it knowing that. It bought it knowing that. Under the bankruptcy code, the bankruptcy code gives you the right to get paid. They are paid the full amount of their debt. They don't have the right to take out of the bankruptcy estate some increased value as long as the amount of their debt is paid. And it will be paid under this plan. It gets paid over the 40-year period. Over the 40 years, right? Over the 40 years. Is the life of the plan 40 years, too? The life of the plan is 40 years. It was the life of the original note. The plan, the court looked to the fact that there is a market for 40-year loans for affordable housing. It looked to the fact that there was evidence that there was a 48-year useful life of this property, that there are multiple properties that have 40 years. I'm not a, you know, I never was a bankruptcy practitioner, but is a 40-year plan sort of? It sounds kind of unique. It is unusual, but it is not unusual in the affordable housing context because that's the time period pursuant to the Treasury regulations for affordable housing transactions. And this, in fact, was that the original affordable housing loan had an interest rate that was a 0.4 percent below the then prime rate. Now it's 1.15 percent above the current prime rate. It is well within the standpoint of the Till regulations or the Till statement by the Supreme Court of interest rates of 1 percent to 3 percent above prime. The court, the bankruptcy court, followed Till and Rash to a tee. And in terms of what we have here are findings of fact. That meant that. Really?  Rash. Why did Rash suggest that the foreclosure value can be higher than the value applied through the bankruptcy? Rash did not say that, Your Honor. Instead, to the contrary, Rash said that foreclosure value would not always be less than a plan. It said it is typically lower. That's at 520 U.S. at 960. Does it ever suggest that it's ever higher? I can understand they can be exactly the same, but it's not always lower. I see nothing in Rash that suggests that, because Rash talks about the additional risk put on the lender if it's not allowed to foreclose. In this case, the lender is not allowed to foreclose, takes the additional risk, and gets a lower amount as a result. But, Your Honor, the original note was 8.5. Now the value is 7 to 7, 7 to possibly 8. The court was finding 7.6. It is lower than the original note amount, but in the hands of this particular buyer that bought it, realizing the bankruptcy risk, realizing the risk of a stretch out, the bank would profit because it bought at a lower amount. Realizing the bankruptcy risk means, yes, it's translated to mean realizing that it might not be allowed to foreclose and would have to accept a value lower than the foreclosure value. That it would have to accept a value based upon the use of the property under the plan. That's what Rash says. Rash expresses that. Kennedy, I'm not so sure about that either. Go ahead and read that quote from Rash, and then we'll revisit it. First, the court said no. 1, the court said, quote, the code's cram-down option displaces a secured creditor's State law right to obtain immediate foreclosure upon a debtor's default. That's what it says. And this does, in fact, because the court in Rash looked at two things. It looked to Section 506a of the Bankruptcy Code, which says you value the secured creditor's interest by looking at the value of the creditor's interest in the estate's interest in light of the proposed disposition or use. And the court said you look at the proposed disposition or use, you look first to the estate's interest, and here the estate's interest is restricted by the affordability restriction. And here's the use language in particular in Rash. I'm sorry? The disposition, quote, the, quote, disposition or use, close quote, of the collateral thus turns on the alternative the debtor chooses. In one case the collateral will be surrendered to the creditor. That's disposition. And in the other the collateral will be retained and used by the debtor. That's use. But I don't see anything in that use of the word use that suggests use exactly in the same way the debtor's been using it before and would like to continue using it by its preference, in this case affordable housing. Rash said that actual use, rather than a foreclosure sale that will not take place, is the proper guide under prescription hinged to the property's disposition or use. We don't have a foreclosure sale that's taking place under this plan. What we have is use as affordable housing, which is the use that first Southern's predecessor bought into original. I don't see anything in Rash that takes use beyond the fact the debtor has retained it, the part about the affordable housing part. It's housing. It's the additional limitation that makes it affordable housing. That has a substantial impact on the value. What in Rash says that the cram down can include the lesser value of affordable housing? From the creditor's perspective, I can understand why they think they've been shortchanged. What Rash says is that you look at it from the standpoint of the debtor's use of it and that the someone in the debtor's trade business or situation would pay to obtain like property. This debtor was in the trade business or situation of affordable housing. That's all it was created to do. That's all it ever did. But then look at what Rash goes on to say and do. If a debtor keeps the property and continues to use it, the creditor obtains at once neither the property nor its value and is exposed to double risks. And your client is saying as a result of being exposed to double risks, the bank gets less because it's less than the foreclosure value. How does that follow? But the bank gets less than the amount that it went out and bought this at a song with the expectation of making a quick profit. And less for the alternative. This, Rash says the alternative is the foreclosure value. And it's getting markedly less than that. In this particular instance, it is unusual that the foreclosure value is higher than the sum. It also seems inconsistent with the logic of Rash, which says if the creditor takes additional risk, it ought to get additional value for that. And you're saying, nope, in this case it gets less despite taking the additional risk. Because what you get in bankruptcy is not the right to get your property that's appreciated. You get the right to have your debt paid. And their debt is being paid in accordance with the bankruptcy code and in accordance with the bankruptcy code as interpreted by Rash. You also look to the fact that you have the right to be paid in accordance with the fair and equitable test of the bankruptcy code, which gives you three options, one of which is paying over time with the amount of interest that's going to give you, the present value of your secured note as determined in accordance with Rash, which is what the bankruptcy court did. What does Rash describe as the appropriate way to value the debtor's use of the property? You value it by what a willing buyer in the debtor's trade, business, or situation would pay to obtain like property. And it has to be what could be used. I read Rash to say, quote, the replacement value standard accurately gauges the debtor's use of the property, close quote. What's replacement value here? It's the replacement value of an affordable housing complex. That's what anyone would be able to buy. I would also note that with respect to the fair and equitable test, their argument is completely contrary to the Supreme Court's opinion in Radlax, because in Radlax, the court said that indubitable equivalent is one of the three methods of paying pursuant to the fair and equitable test. And they're saying, no, indubitable equivalent encompasses everything. They're saying it encompasses the first part of fair and equitable. I would note that their expert did not opine specifically with respect to the fair and equitable test as set forth in the bankruptcy code. He said, I'm viewing fairness and equity as those terms may be used in The New York Times. I've never valued something based upon what the actual bankruptcy code standards are. Your time is running out, but could you do me a favor and just explain to me the situation on remand? After it went back for the valuation, including the tax credits, there was a motion made just before the proceedings to elect to proceed under 11, what is it, 1111?  Yes. The district court said that request was un- the bankruptcy court said that request was untimely. Correct. Because it was put forward with just a bare-bones motion, no- But if you assume that it was timely, what's the significance? The significance of that, Your Honor, is that there are really two aspects of that. One is, as analyzed by the district court, and the district court can, of course, look at the two plans and the two contracts and evaluate it. And the district court said that this particular plan, as confirmed the second time around, was not any different. There were no changes to the plan terms themselves. The only change was that they had- And, in fact, it ended up they got a better deal. It got a better deal, didn't adversely affect it, and it has to materially change the plan. So it was tantamount to the same plan. The second part of that, Your Honor, is-I'm sorry-that the protection of 1111B really gives the secured creditor the right to kind of get the upside if there is any defaults later on during the course of the plan term. And that's what the secured creditor got in this case. It has that remedy, that effective equity cushion that kicks in wherever there would be a foreclosure. And also 1111B, the only argument that they gave for needing 1111B was that the best interest test would kick in and that they would have more upon foreclosure. But as set forth in the reasoning of the district court and the bankruptcy court and the stay issues, the best interest test only applies to what the creditor is going to get from the bankruptcy estate, not what it would be able to do with that after that property is out of the bankruptcy state and then closes. Thank you. Thank you. I think you have a little time for rebuttal. Let me please the Court. A couple of quick points in closing here. First of all, from a creditor's standpoint and given that 506 is valuing a creditor's interest, a bank, when it makes a loan, understands that foreclosure is the worst case that happens. It's unfathomable within the banking industry and underwriting of secured loans to understand that there can be a situation where it's compelled to receive less than foreclosure value. Sometimes banks will make an error and they get little at foreclosure, but that's the risk they take, not what occurred in this case. Second, there's been a number of comments from Sunny Slope about how First Southern is somehow paid in full under the current plan. What they mean by that is that over the course of 40 years, First Southern would receive the aggregate amount of $8.9 million. But of course, we know under Section 1129, we don't talk about aggregate dollars. We talk about present value. And so when they say payment in full, they're not being genuine with the Court. Payment in full under this foreclosure value issue would be you would have an $8 million or so secured claim paid. And even if you use 4.4 percent interest, you're going to get $14 more million paid over the course of the 40 years than what they're talking about. So this is material and this is a very substantial property right here. I'm not sure I understand what you're saying. They're getting their loan paid back, right, on the terms that they made it? No. They're not getting it? No. Under the plan, all that First Southern receives is a secured claim of $3.9 million. The cash flow on that $3.9 million at 4.4 percent interest over 40 years doesn't quite get to the $8.9 million, which is the face amount of the debt as we stand here today. So that's why even at the end of the 40 years, there's a balloon payment to get to the $8.9 million. How much did the bank pay HUD? The bank paid, it's in the record, approximately $5 million. So it knew it was taking a risk as well? Pardon? It knew it was taking a risk as well? Whether a bank is making a loan in the first place or whether it's buying paper, which is a very important part of commerce, that there are parties out there that are willing to buy papers from, for example, the FDIC or HUD in this case, they have an expectation that there's a claim. And if it was understood that somehow by buying a note they were a second-class citizen, I do not think that would be well received in the marketplace. Well, they knew they didn't have $8 million in their pocket because they only had to pay 5. I'm not sure I follow. Well, they paid, let's say, 5 million? Correct. And they're now claiming that they have a right to foreclose on property collecting in short order almost all of an $8 million note. That's, I guess, the current balance outstanding on the HUD note. And so if the property value is $7.5 million has been tossed around, they'll wind up making a profit of $2.5 million in a few years. Well, the issue, there's always risk involved with these situations. And it's not as easy to do. And that's exactly the question that I'm posing. The bank went into it knowing there was risk involved. They understood that they would be able to recover a foreclosure value. They have that expectation. Yes. Thank you. Okay. Thank you. Cases filed stand submitted. We are adjourned.
judges: Kozinski, Paez, Clifton